ALICIA ROACH ET AL. *v.* IVARI INTERNATIONAL
CENTERS, INC., ET AL.
(AC 22310)

Lavery, C. J., and Schaller and Dupont, Js.

94

Argued February 20—officially released May 27, 2003

*W. Anthony Stevens, Jr.,* with whom was *Louis W. Flynn, Jr.,* for the appellants (plaintiffs).

*Robert G. Clemente*, with whom, on the brief, was *Lorinda S. Coon*, for the appellees (defendants).

*Opinion*

DUPONT, J. The plaintiffs, Alicia Roach and James J. Roach, appeal from the judgment rendered in favor of the defendants after a trial to the court in which the plaintiffs sought to hold the defendants liable for alleged damage to the hair and scalp of Alicia Roach.[1] On appeal, the plaintiffs claim that the court improperly concluded (1) that the defendants were not negligent, (2) that the plaintiffs were required to present expert testimony regarding the standard of care in the hair implant industry[2] and (3) that the defendants did not breach their contract with the plaintiffs. We discuss the first and second claims together because the presence or absence of negligence rests in part on the type of care or standard of care to be used in a particular situation.

The following facts, as found by the court in its memorandum of decision, are relevant to our resolution of the plaintiffs' claims. Alicia Roach is a retired epidemiologist, seventy years old at the time of trial, who had suffered from hair loss for some years prior to the events that are the subject of her action.

In the spring of 1996, the plaintiff saw the defendants' magazine advertisement for microcylinder intervention (intervention), a nonsurgical procedure that involves

[1] "Plaintiff" in the singular as used in this opinion refers to Alicia Roach. James Roach, her husband, seeks damages for the sums he expended or will expend for treatment of his wife's hair loss. The defendants are Ivari International, Inc., and Ivari International Centers, Inc., corporations with principal places of business in Beverly Hills, California, and New York, New York, respectively, and Edward Ivari. The words "defendants" or "Ivari" refer to the corporate entities or their representatives because there was no evidence as to any individual acts or liability of Edward Ivari.

[2] The court described the industry as a "hair extension industry for a microcylinder attachment procedure" or "a surgical glue attachment procedure."

the intermingling of donor hair with a client's natural hair to provide a fuller appearance of hair.

After consulting with her physician, the Roaches traveled to New York and met with an Ivari representative. James Roach on June 24, 1996, signed a contract with Ivari in which Alicia Roach is described as the client. The contract briefly described the intervention procedure, the recommendation of adjustments after the initial intervention, the scheduling date of the intervention and the time for payment. The Ivari representative explained the details of the intervention[3] and the periodic maintenance procedures.[4] The representative did not provide any warning of any potential side effects, but did state that the intervention would not prevent or slow additional hair loss.

In July and August, 1996, James Roach paid $15,245 and $10,000 to Ivari. On August 18 and 19, 1996, the

---

[3] The court found that as explained by the representative, the "intervention involves use of skeins of natural donor hair. Each skein consists of a line of hairs attached to a thread about one inch in length. The threads are then attached end to end in concentric circles over the client's head. The circles of thread are then anchored to each other by separate threads, which radiate from the center so that the underside of the resulting hairpiece resembles a spider's web. The client's natural hair is attached to the hairpiece by forty to sixty separate threads. Each of those threads is attached at one end to the web and at the other end to a tiny metal clamp around a few strands of natural hair at the scalp. Every few weeks, as the natural hair grows out from the scalp, the hairpiece loosens on the head. This places increased tension on the natural hair to which the microcylinders are attached and can cause hair breakage."

[4] The court found that a maintenance procedure, according to the Ivari representative, "is necessary wherein the clamps must be removed and replaced closer to the scalp. A maintenance tightens the hairpiece on the client's head." Although maintenance is recommended, the contract did not provide that the defendants were to supply it. The contract stated only that adjustment to the microcylinders was recommended "4 to 8 times per year" and "may be performed at any one of [Ivari's] international centers, cost of which is *not* covered under this contract." (Emphasis added.) The contract price did not include any maintenance by the defendants and provided that the plaintiff or "someone around" the plaintiff could be taught the adjustment process.

procedure was performed in Ivari's Beverly Hills, California, office.[5] Within one month after the procedure, the plaintiff began to suffer from scalp itching, about which she complained to Ivari on a visit on October 16, 1996. An Ivari representative informed her that the itching was a temporary condition.

After that visit, the plaintiff still suffered from an itching scalp, which often kept her awake at night. She made further complaints about the itching to Ivari, to her coworkers and to her hairdresser, Nelson Jimmo. Jimmo recommended that the plaintiff see a dermatologist. On December 6, 1996, when the plaintiff saw Gary L. Last, a dermatologist, she no longer complained of scalp itching. Last saw no signs of irritation or disease, but thought that the hairpiece might have contributed to the plaintiff's hair loss and recommended the removal of the hairpiece. He observed hair breakage, which he attributed either to the traction of the hairpiece or to the plaintiff's past history of permanent waves or to the use of relaxers.

The plaintiff returned to Jimmo so that he could remove the hairpiece. As a combined result of the snipping off of threads of hair at the underside of each microcylinder and the breaking off of some hairs from tension on the hair when the hairpiece became loose, there was a significant bald spot on the plaintiff's head after the removal.

Thereafter, the plaintiff wore wigs for several months until her natural hair grew back. Although the plaintiff's hair is thinner now than it was prior to the procedure,

---

[5] Although the contract was executed in New York state and was performed in California, the parties and the court treated the case as one governed by Connecticut law. The only Connecticut nexus is the domicile of the plaintiffs. Because the case does not rest on a statute or statutes that might vary among the states and the parties did not argue at trial that another state's law applies, we have decided the case without any consideration of conflict of laws principles.

that is due in part to her regular visits to the hairdresser, to the continued hair thinning, which had been occurring for some years prior to the intervention, and to the residual effects of hair breakage following the intervention procedure. The court noted that "Ivari, Inc., is in the business of installing exorbitantly priced hairpieces on the heads of people with thinning hair. These hairpieces are the functional equivalent of wigs and might be expected to look and feel like wigs after attachment."

The plaintiffs filed their action against the defendants alleging negligence, breach of contract and negligent infliction of emotional distress.[6] The case was tried to the court over three days, with the court concluding that judgment should be rendered for the defendants on all counts.

We first set forth the applicable standard of review. This case involves both findings of fact and conclusions of law. "If the factual basis of the court's decision is challenged, our review includes determining whether the facts set out in the memorandum of decision are supported by the record or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous. . . . With regard to the

---

[6] The allegations of negligence in the plaintiff's amended complaint were that the defendants had "failed to warn the [p]laintiff that said installation would cause scalp discomfort and itching"; failed to inform the [p]laintiff that the device when installed was likely to break or pull out sections of her scalp hair"; "failed to inform the [p]laintiff that the installation of th[e] device would cause her to lose additional hair"; and "sold to the [p]laintiff a device and installed the same and she was concerned about thinning hair and said installation caused that condition to become worse."

The alleged breach of contract was that the "aforementioned problems and need for remediation constitutes a breach of . . . contract . . . ." The allegation of infliction of emotional distress was that the defendants knew or should have known that "the carelessness and negligence of the installation and maintenance" would cause the plaintiff to suffer "generous amounts of hair loss and [that] the resultant disfigurement . . . would cause emotional distress likely to result in physical harm . . . ."

trial court's factual findings, the clearly erroneous standard of review is appropriate. . . . The trial court's legal conclusions are subject to plenary review. [W]here the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision." (Internal quotation marks omitted.) *Maloney* v. *PCRE, LLC*, 68 Conn. App. 727, 734–35, 793 A.2d 1118 (2002).

## I

## NEGLIGENCE CLAIMS

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." *RK Constructors, Inc.* v. *Fusco Corp.*, 231 Conn. 381, 384, 650 A.2d 153 (1994). If a plaintiff cannot prove all of those elements, the cause of action fails. *Santopietro* v. *New Haven*, 239 Conn. 207, 225, 682 A.2d 106 (1996). The court concluded that the plaintiffs failed to prove the existence of a duty to warn or that the "sale or installation of the hairpiece . . . caused damage to Alicia Roach's scalp or hair."

"The existence of a duty is a question of law and only if such a duty is found to exist does the trier of fact then determine whether the defendant violated that duty in the particular situation . . . ." (Internal quotation marks omitted.) *Gould* v. *Mellick & Sexton*, 263 Conn. 140, 153, 819 A.2d 216 (2003); see also *Petriello* v. *Kalman*, 215 Conn. 377, 382–83, 576 A.2d 474 (1990). "A duty . . . may arise . . . from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." (Internal quotation marks omitted.) *Greene* v. *Perry*, 62 Conn. App. 338, 341, 771 A.2d 196, cert. denied, 256 Conn. 917, 773 A.2d 1143

(2001). To implicate a duty to warn, a plaintiff must show that the defendant knew that a danger existed. *Davies* v. *General Tours, Inc.*, 63 Conn. App. 17, 22, 774 A.2d 1063, cert. granted on other grounds, 256 Conn. 926, 776 A.2d 1143 (2001) (appeal withdrawn October, 18, 2001); see also *Sharp* v. *Wyatt, Inc.*, 31 Conn. App. 824, 852, 627 A.2d 1347 (1993), aff'd, 230 Conn. 12, 644 A.2d 871 (1994).

The court specifically found that the plaintiffs "produced no credible evidence to show that itching, discomfort or hair breakage were side effects reasonably to be expected from the intervention procedure by the [defendants] or by anyone else." That finding is supported by the record. The court found that the plaintiff had offered no evidence to show the standard of care regarding the issuance of warnings in connection with the procedure. Therefore, the court's conclusion that a duty to warn was not established was legally and logically correct. Without having established a duty to warn, the plaintiff cannot establish a breach of such duty. Even if the court had found a duty to warn and a breach of that duty, the plaintiff could not prevail unless causation was found.

The court concluded that the plaintiffs had failed to prove that the lack of a warning caused the injuries to the plaintiff. The court found (1) that she had an ongoing hair loss condition, (2) that she regularly went to a hairdresser for shampooing, coloring, highlighting and styling, (3) that her physician had attributed her hair breakage to either her history of permanent waves and relaxers or to the traction of the hairpiece in combination, (4) that when her hairdresser removed the hairpiece, he snipped some of her hair and (5) that her now thinner hair is due to the natural process of continued hair thinning, which began before the intervention. On the basis of those facts, the court's conclusion that the plaintiffs had failed to present any evidence of a causal

connection between the defendants' device and the lasting thinness of Alicia Roach's hair was legally and logically correct.

The plaintiffs also claim on appeal that the court improperly concluded that they were required to produce expert testimony to support their negligence claims. The plaintiffs' claims of negligence primarily relate to an alleged duty to warn Alicia Roach that the procedure would cause (1) scalp discomfort, (2) sections of her hair to break, (3) the loss of more of her hair and (4) her condition to become worse. The defendants argue that the court did not base its judgment on the lack of expert testimony produced by the plaintiffs, but used that as part of its conclusion that the plaintiffs had not proven their case. We agree with the defendants.

The plaintiffs produced no expert testimony in support of their claims. Expert testimony is required to support a claim of a breach of a duty if "the determination of the standard of care that governs the duty requires knowledge that is beyond the experience of [the] fact finder . . . ." (Internal quotation marks omitted.) *Doe* v. *Yale University*, 252 Conn. 641, 686–87, 748 A.2d 834 (2000). At the close of the evidence, the defendants sought to dismiss the action on the ground that the plaintiffs had not presented any expert testimony on the standard of care required in the industry for either the installation of the hairpiece[7] or any necessary warnings. The court denied that motion, finding that the plaintiffs were not required to submit expert testimony and that the court would evaluate the plaintiffs' case on the evidence submitted.

[7] The defendants claim that the plaintiffs' complaint does not allege negligence arising from the installation of the hairpiece, but negligence from a duty to warn. The plaintiffs, however, did allege in paragraph 7A (d) of the negligence count that the defendants had been negligent in the sale and installation of the device.

The court, therefore, despite the lack of expert testimony, went on to consider the evidence presented by the plaintiffs in light of their burden to prove the essential elements of their complaint. In its memorandum of decision, the court did state that the plaintiffs "offered no expert testimony as to the standard of care in the hair extension industry regarding the issuance of warnings" and that the plaintiffs "provided no expert witness . . . to establish a particular standard of care [as to the selling and installing of the hairpieces]." Those statements regarding the expert testimony merely were an acknowledgment that expert testimony would have been helpful to the court in rendering its decision. The court, however, independently considered the evidence. The court stated that in the absence of expert guidance to establish a particular standard of care with regard to warnings, the court could, as the trier of fact, rely on the ordinary knowledge of a trier of fact.[8] The standard of care in the ordinary negligence case is the care that a reasonably prudent person would exercise under the same circumstances. *Smith* v. *Leuthner*, 156 Conn. 422, 424–25, 242 A.2d 728 (1968).

In light of the court's denial of the defendants' motion to dismiss and a close reading of the court's memorandum of decision, we conclude that the court properly considered all of the plaintiffs' evidence and did not base its decision on the lack of expert testimony.

The plaintiff also claimed negligent infliction of emotional distress. To establish that claim, the plaintiff must show that "the defendant should have realized that its conduct involved an unreasonable risk of causing emotional distress and that that distress, if it were caused, might result in illness or bodily harm." (Internal quota-

[8] In view of the court's finding that the Ivari hairpiece was the functional equivalent of a wig, the court could have concluded that the plaintiffs' claims could be decided as a matter of common knowledge. See *Santopietro* v. *New Haven*, supra, 239 Conn. 225.

tion marks omitted.) *Perodeau* v. *Hartford,* 259 Conn. 729, 749, 792 A.2d 752 (2002). "[R]ecovery for unintentionally-caused emotional distress does not depend on proof of either an ensuing physical injury or a risk of harm from physical impact." (Internal quotation marks omitted.) Id. A plaintiff is not "entitled to damages for emotional distress unless the [plaintiff can establish] that the defendant knew or should have known that [the defendant's] conduct gave rise to an unreasonable risk of causing emotional distress that might result in illness or bodily harm." *Scanlon* v. *Connecticut Light & Power Co.,* 258 Conn. 436, 445, 782 A.2d 87 (2001).

Having concluded that the plaintiffs failed to show any negligence on the part of the defendants, the court's conclusion that the plaintiff's emotional distress was not caused by the negligence of the defendants was legally and logically correct. The general conclusion of the court was that the plaintiff "was distressed and humiliated that she had spent large sums of money for the intervention with such dismal results." The thinning of her hair, however, was to be expected due to "the natural process of continued hair thinning, which had been occurring for some years prior to the intervention," rather than the negligence of the defendants. Her "disappointment in the hairpiece, its removal and her resulting emotional distress cannot be laid" at the defendants' door. On the basis of the evidence and the law, we agree.

## II

### BREACH OF CONTRACT

The plaintiffs claim that the court improperly concluded that the defendants did not breach their contract. The defendants argue that the plaintiffs failed to show any breach of contract.

James Roach entered into a contract with the defendants on June 24, 1996. By the terms of the contract,

the defendants were to install the Ivari device for Alicia Roach,[9] and James Roach was to pay for the installation. The defendants performed their part of the contract on August 18 and 19, 1996, when the installation was complete. The breach alleged by the plaintiffs was that the installation caused "deleterious" results. The defendants' promise based on the contract, however, did not purport to promise a specific result, but only promised to install the device. The contract provided only that the defendants would install a hairpiece in a nonsurgical procedure, but it did not provide that the defendants would maintain the device. The court's findings that the defendants "did the intervention skillfully, carefully, diligently and in a workmanlike manner" are supported by the record and are not clearly erroneous. Those findings support the court's conclusion that the defendants did not breach their contract.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[9] Alicia Roach did not enter into a written contract with the defendants, as alleged in the count of her complaint alleging breach of contract. Also, she has not alleged in her complaint that there was a contract based on the oral representations the defendants had made to her. She has not claimed in her complaint or in her arguments to this court or to the trial court that she is a third party beneficiary of the contract as the "client" in the contract on whose scalp the intervention device was to be installed. We need not consider, however, whether Alicia Roach could recover individually in her breach of contract claim because of the conclusions of the trial court that there was no breach of contract, with which we agree.